IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------x
                                                   :

ROTH STAFFING COMPANIES, L.P.       :                 3:13 CV 216 (JBA)
                                                   :

                                                   :

v.                                                   :

                                                   :

THOMAS BROWN and OEM            :           DATE: OCTOBER 16, 2013
PROSTAFFING, INC.                  :
                                                   :
-------------------------------------------------------x

<u>RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>

On February 15, 2013, plaintiff Roth Staffing Companies, L.P. ["Roth Staffing", "plaintiff," or "the Company"] commenced this diversity action against defendants Thomas Brown and OEM ProStaffing, Inc. for breach of contract (Count I), tortious interference with contract (Count II), and misappropriation of trade secrets arising out of Brown's alleged violation of the non-compete, confidentiality, and no-solicitation provisions of his Employment Agreement with Roth Staffing, under the Connecticut Uniform Trade Secrets Act ["CUTSA"], CONN. GEN. STAT. § 35-51 <u>et seq.</u> (Count III). (Dkt. #1).  The same day, plaintiff filed the pending Motion for Preliminary Injunction and brief in support (Dkts. ##3-4),[1] along with a Motion for Order to Show Cause (Dkt. #5), the latter of which was granted on August 1, 2013.  (Dkt. #38).  On March 22, 2013, the pending motions were referred to this Magistrate Judge by United States District Judge Janet Bond Arterton.  (Dkt. #22).  After a telephone status conference was held on May 7, 2013 (<u>see</u> Dkts. ##27-28), a preliminary injunction hearing was scheduled for June 27, 2013.  (Dkt. #29).  On June 25, 2013, the parties filed

---

[1]Attached to plaintiff's brief in support are the following exhibits: copy of the Employment Agreement, signed on June 8, 2010 (Exh. A); copy of job listings for OEM ProStaffing (Exhs. B-C); and copies of letters from plaintiff's counsel to defendant OEM ProStaffing and defendant Brown, dated January 17, 2013, with a copy of the Employment Agreement attached (Exh. D).

a Joint Motion for Stipulated Order in which the parties stipulated to some, but not all, of the relief requested in plaintiff's Motion for Preliminary Injunction. (Dkt. #30). The next day, the parties' Stipulated Order was signed by this Magistrate Judge. (Dkt. #34). The parties also requested a continuance of the preliminary injunction hearing, which, after several conference calls, was continued to August 8, 2013. (See, e.g., Dkts. ##33, 35-37). At the August 8th hearing before this Magistrate Judge, defendant Brown, Corey Miller, Roth Staffing's Regional Vice President, and Wendy Ward, Roth Staffing's Practice Manager, testified. (See Dkts. ##39, 40, 45). The next day, this Magistrate Judge granted plaintiff's Motion for Preliminary Injunction to the extent agreed upon by parties in the Stipulated Order, "with the additional (and continuining) injunctive relief sought by plaintiff to be addressed in this Magistrate Judge's Recommended Ruling, to be filed after the parties' post-hearing briefs have been filed." (Dkt. #41)(emphasis omitted).

On August 29, 2013, defendants filed their brief in opposition to plaintiff's Motion for Preliminary Injunction (Dkt. #46), and the next day, plaintiff filed a redacted post-hearing brief (Dkt. #48), along with an unredacted version of its post-hearing brief, filed under seal. (Dkts. ##47, 49-50).[2] On September 13, 2013, defendants filed their reply in opposition to plaintiff's post-hearing brief (Dkt. #54), and that same day, plaintiff filed its reply in further support of its Motion for Preliminary Injunction. (Dkt. #55).[3]

## I. DISCUSSION

In its Motion for Preliminary Injunction, plaintiff seeks to enjoin defendants as follows:

---

[2]For ease of reference, in this Ruling, the Court will refer to plaintiff's redacted brief. (Dkt. #48). Attached to both briefs were copies of the exhibits from the August 8th hearing.

[3]Attached to plaintiff's reply brief are copies of unpublished case law.

1. Defendants shall not, directly or indirectly, use or divulge, disclose or communication Roth Staffing's confidential information;

2. Brown shall not, directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected as an officer, employee, agent, independent contractor, partner, shareholder, or principal of any corporation, partnership, proprietorship, firm, association, person, or other entity which directly or indirectly competes with Roth Staffing within [twenty-five] miles of any location of Roth Staffing at which Brown worked or was assigned, other than as a passive stockholder in such corporations whose stock is traded on a recognized stock exchange;

3. Brown shall not, directly or indirectly or by action in concert with others, solicit, induce or influence (or seek to induce or influence) any customer or prospective customer of Roth Staffing for the purpose of promoting or selling any products or services competitive with those of Roth Staffing.   This limitation only shall apply to customers and prospective customers known to Brown or with whom Brown had contacts or dealings during his employment by Roth Staffing;

4. Brown shall not, directly or indirectly or by action in concert with others, solicit, induce or influence (or seek to induce or influence) any person who is engaged (as a temporary or regular employee, agent, independent contractor, or otherwise) by Roth Staffing or terminate his or her employment or engagement; and

5. Within [twenty-four] hours, Defendants shall deliver Roth Staffing any and all confidential information of Roth Staffing and any and all property of Roth Staffing which is in either of the Defendants' possession or control.

(Dkt. #3, at 1-2).

A. STIPULATED ORDER

On June 25, 2013, the parties filed a Joint Motion for Stipulated Order Pending Ruling on Motion for Preliminary Injunction (Dkt. #30), in which Order (Dkt. #34) the parties stipulate as follows:

1. Defendants shall not, directly or indirectly, use or divulge, disclose or communicate Roth Staffing's confidential information;

2. Defendants shall not, directly or indirectly or by action in concert with others, solicit, induce or influence (or seek to induce or influence) any Customers of Plaintiff for the purpose of promoting or selling any products or

services competitive with those of Plaintiff.  For purposes of this Stipulated Order, "Customers" means any and all customers known to Defendant Thomas Brown . . . or with whom Brown had contacts or dealings during his employment by Plaintiff;

3. Defendants shall not, directly or indirectly or by action in concert with others, place any candidates for temporary or permanent employment with any Customers of Plaintiff with the exception of Connecticut Spring and Stamping, and with the exception of job orders which are currently outstanding as of June 24, 2013;

4. Defendants shall not, directly or indirectly or by action in concert with others, solicit, induce or influence (or seek to induce or influence) any person who is engaged (as a temporary or regular employee, agent, independent contractor, or otherwise) by Plaintiff to terminate his or her employment or engagement; and

5. Defendants shall not request any further continuances of the hearing on Plaintiff's Motion for Preliminary Injunction, unless it is for an unforeseen medical circumstance or other unforeseen circumstance.

(Dkt. #34, at 1-2).

Thus, in the Joint Motion for Stipulated Order, the parties reached an agreement on three of the issues addressed in plaintiff's Motion for Preliminary Injunction, and such agreement was reached as to all defendants, and not limited to defendant Brown, as was originally requested in plaintiff's Motion. Specifically, the parties stipulated to the first request of the five presented in its Motion for Preliminary Injunction, in that they have agreed that defendants "shall not, directly or indirectly, use or divulge, disclose or communicate Roth Staffing's confidential information[.]" (Compare Dkt. #3, ¶ 1 with Dkt. #34, ¶ 1). Additionally, the parties reached an agreement in part as to the third and fourth requests, which provide that defendants are enjoined from soliciting, inducing, or influencing any customers "known to Brown or with whom Brown had contacts or dealings during his employment by Roth Staffing[,]" (compare Dkt. #3, ¶ 2 with Dkt. #34, ¶ 3), and defendants shall not "solicit, induce or influence (or seek to induce or influence) any person who is

4

engaged . . . by Roth Staffing to terminate his or her employment or engagement."
(Compare Dkt. #3, ¶ 4 with Dkt. #34, ¶ 4).

In the Stipulated Order, the parties did not address plaintiff's second request, namely that defendant Brown be enjoined from future involvement with companies which directly or indirectly compete with Roth Staffing, within twenty-five miles of any Roth Staffing location at which Brown worked, nor did the parties address plaintiff's fifth request, that is defendants' return of any and all confidential information and/or of Roth Staffing which is either of the defendants' possession or control.  (Dkt. #3, ¶¶  2, 5).

B. FACTUAL FINDINGS

1. BUSINESS OF ROTH STAFFING

Plaintiff Roth Staffing is in the business of providing a variety of staffing, recruiting and administrative services, including temporary staffing and hiring, direct hiring, and executive search and recruitment.  (Dkt. #45, Preliminary Injunction Hearing Transcript ["Tr."] at 3-4).  Defendant Brown was first employed by plaintiff from April 2006 to Septemeber 2007, and he returned from June 2010 to September 2012; he worked out of the Hartford office, located at 280 Trumbull Street in Hartford, Connecticut.  (Id. at 5, 7, 18).  Brown was offered his position in a letter dated May 19, 2010, with a  start date of June 7, 2010.  (Hearing Exh. 1; Tr. at 7-8).  Upon signing this offer letter, Brown acknowledged that his "offer of employment is contingent upon receipt of [his] signed and accepted employment agreement. . . . "  (Hearing Exh. 1; Tr. at 8).  Defendant Brown signed the employment agreement ["Employment Agreement"] on June 8, 2010.  (Hearing Exh. 2; Tr. at 8-9).[4]

_____

[4]Brown acknowledged that he signed an employment agreement with Roth Staffing during his first employ in 2006 and the terms of the 2010 employment agreement were similar to the agreement signed in 2006.  (Tr. at 10).

5

In Section 3.1 of the Employment Agreement, Brown acknowledged that he "will have access to confidential information maintained at substantial cost by the Company regarding its temporary employees, regular employees, applicants, and prospective and actual customers." (Hearing Exh. 2, § 3.1).  Brown agreed that "[t]his information is proprietary to the Company and, if used by competitors or other third parties, could cause substantial and irreparable damage to the Company."  (Id.).

In Section 3.1 of the Employment Agreement, Brown also agreed as follows:

> All equipment, notebooks, documents, memoranda, reports, computer programs, forms, files, books, correspondence, lists, or other written and graphic records or other information storage devices, and the like, including innovations, ideas and developments, affecting or relating to the business of the Company, which Employee shall prepare, use, construct, observe, possess, or control, shall be and remain the Company's sole property.

(Id.).  In the event of termination, Brown agreed to "deliver promptly" to Roth Staffing all of the "equipment, notebooks, documents, memoranda, reports, files, samples, books, correspondence, lists, or other written or graphic records, and the like" relating to Roth Staffing's business, "which are or have been" in Brown's possession or under his control.  (Id. § 3.2).

In Section 3.3 of the Employment Agreement, Brown agreed during the term of his employment, and for a period of one year thereafter,

> he[ ] will not, directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected as an officer, employee, agent, independent contractor, partner, shareholder, or principal of any corporation, partnership, proprietorship, firm, association, person, or other entity which directly or indirectly competes with the Company within [twenty-five] miles of any location of the Company at which the Employee worked or was assigned, other than as a passive stockholder in such corporations whose stock is

---

The Employment Agreement provides that it "and any cause of action arising out of the employment relationship shall be governed by the laws of the State of Connecticut, without regard to its conflicts of laws principles."  (Hearing Exh. 2, § 4.2).

traded on a recognized stock exchange.

(Id., § 3.3).

Section 3.6 of the Employment Agreement which, governs the solicitation of customers and prospective customer, reads:

> During the term of this Agreement and for a period of one year after the employment relationship between the parties terminates, Employee agrees that he[] will not, directly or indirectly or by action in concert with others, solicit, induce or influence (or seek to induce or influence) any customer or prospective customer of the Company for the purpose of promoting or selling any products or services competitive with those of the Company.  This limitation only shall apply to customers and prospective customers known to the Employee or with whom the Employee had contacts or dealings during his[] employment.

(Id., § 3.6).

Section 4.3 of the Employment Agreement, entitled "Tolling and Severability[,]" reads:

> Employee agrees that the time provisions contained in Sections 3.3, 3.5 and 3.6 shall be tolled by the length of time during the period of which Employee is in breach of said provisions.  Should any of this portion of this Agreement be determined by any arbitrator or court of competent jurisdiction to be invalid, the remainder of the Agreement will remain in full force and given an effect as near as possible to the original intent of the parties. . . . [I]f any such restriction is found by an arbitrator or court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable.

(Id., § 4.3).

During his latter employ with Roth Staffing, Brown worked in the Ultimate Staffing line of business as a Business Solutions Manager ["BSM"].  (Tr. at 4-5). In his role as a BSM, Brown was the primary contact for customers and job candidates.  (Id. at 5-6).  According to Brown, he would establish contacts by calling publicly available telephone numbers,

through websites that list the human resources contacts, or by "walk[ing] through the front door[.]" (Id. at 12-13; see also id. at 71). Corey Miller, the Regional Vice President of Roth Staffing, explained that Roth Staffing encourages its customers to contact BSMs directly, and that it is important that Roth Staffing build rapport, trust and confidence with its customers as that will lead to long-term business. (Tr. at 105-07). Recurring business is particularly important because it is difficult to create new business relationships with potential customers. (Id. at 107-08). The relationship building process is something that takes time and something that BSMs are expected to do, and for which they are compensated. (Id. at 111).

Similarly, Brown testified that his customers' preferences, the methods they liked to use to communicate with their staffing providers, and the types of positions they needed to fill, were "learned over time." (Id. at 13-14). Customer information was then stored in Roth Staffing's software program called Staff Suite. (Id. at 15). The Staff Suite program details information regarding Roth Staffing's customers and job candidates, including notes from customer contacts, customers' purchasing histories, jobs filled, pay rates, bill rates, past relationships, overall utilization, and how and when each customer hires temporary or permanent employees. (Id. at 13-15). When working for Roth Staffing, defendant Brown was involved in setting Roth Staffing's bill rates, which information is not publicly available. (Id. at 14-15).[5] The Staff Suite program is password protected, and as defendant Brown acknowledged, this information is valuable to Roth Staffing's competitors, and Roth Staffing expends a substantial cost to maintain this program. (Id. at 15-17, 99,113). In addition to keeping this program password protected, Roth Staffing asks every employee to sign a noncompete as a means of protecting their confidential information (id. at 113), and Brown

---

[5]Brown later testified that to learn bill rates, he "can call and ask the decision maker [and] [t]hey'll almost readily give it to you." (Id. at 72). But see note 10 infra.

signed such a noncompete by virtue of signing his Employment Agreement.  Miller explained that this "protected database[]" is "probably one of the most valuable parts of [Roth Staffing's] business." (Id. at 111; see also id. at 112).

## 2. STAFFING NOW INCORPORATED

After plaintiff left Roth Staffing at the end of September 2012, plaintiff worked for one week, from October 29 to November 2, 2012, at Staffing Now Incorporated ["SNI"], in Holyoke, Massachusetts; SNI is located approximately fifteen miles from Brown's home in East Longmeadow, Massachusetts.  (Id. at 20-21).  Since Holyoke is more than twenty-five miles from Hartford, it is not covered by the twenty-five-mile geographic restriction contained in Section 3.3 of the Agreement.  (See Hearing Exh. 2, § 3.3; see Tr. at 118).

SNI hired Brown at a higher base salary ($75,000) than he earned at Roth Staffing ($65,000), and he was eligible for commissions on top of his salary from SNI. (Tr. at 21, 23). However, after one week of employment, Brown quit his job at SNI.  (Id. at 21).

## 3. OEM PROSTAFFING

On November 7, 2012, five days after quitting SNI, Brown started working for defendant OEM ProStaffing, which is located at 330 Roberts Street in East Hartford, Connecticut, approximately three miles from Roth Staffing's Hartford Office.  (Id. at 3, 21-22; Hearing Exh. 3).  David Fernandez is the owner and president of OEM ProStaffing, and he is also the owner and president of OEM America.  (Id. at 25).[6] OEM ProStaffing had no

---

[6]OEM America is a professional employer organization ["PEO"]; staffing services is only a "portion of what they do."  (Id. at 25).  In fact, while Brown was employed by Roth Staffing, David Fernandez, in his role as president of OEM America, referred Lincoln Waste to Brown for staffing services, as OEM American did not offer such services.  (Id. at 25-26).

During his hiatus from plaintiff, Brown worked for Fernandez at OEM America in 2009 and 2010 selling PEO services, or as Brown testifed he "[t]ried to[]" sell those services.  (Id. at 61; see id. at 69-70 (Brown testified he did not sell any PEO services in the nine months that he was with

employees or customers before it hired Brown in November 2012.  (Id. at 24).   OEM

Prostaffing hired Brown at the same base salary that he earned at Roth Staffing, plus a

twenty-five percent commission on "new business" he produces for OEM Prostaffing.  (Id.

at 22-24; Hearing Exh. 3).  The twenty-five percent commission rate is higher than Brown's

commission rate at SNI and much higher than the 3.5 percent commission rate at Roth

Staffing.  (Tr. at 24).[7]

### 4. CUSTOMERS

#### a. CONNECTICUT SPRING AND STAMPING

While working at Roth Staffing, Brown developed Connecticut Spring and Stamping

["Connecticut Spring"], located in Farmington, Connecticut, as a customer for Roth Staffing.

(Id. at 35, 53; see Hearing Exh. 7).  Brown explained that he had called the contact at

Connecticut Spring "for years to get business[]" and he first met her when working for Roth

Staffing.  (Id. at 35-36).    Over time, Brown generated business for Roth Staffing from

Connecticut Spring, and increased Roth Staffing's share of such business, all while Roth

Staffing was paying Brown's salary and commission.  (Id. at 36-38).   Eventually, the

Connecticut Spring account became the biggest account that Brown handled for Roth

Staffing.  (Id. at 35).

At the time that Brown left Roth Staffing in September 2012, he was the only person

---

that company); see note 10 infra).  In 2009, plaintiff signed a noncompete agreement with OEM
America that covered the entire State of Connecticut and Hampden County, Massachusetts, in
which Holyoke is located.  (Id. at 62-64; Hearing Exh. 11).

[7]Brown testified that he has not received his twenty-five percent commission.  (Id. at 79).
He also testified that, "I think [twenty-five] percent had to be an absolute mistake as written in
there.  You couldn't do business giving someone a [twenty-five] percent commission. It would be
astronomical.  It would be two to three times the average commission."  (Id. at 102).  Just "a few
weeks" prior to his deposition, and within three months of the preliminary injunction hearing,
Brown started to receive some commissions.  (Id. at 79).

in the Company who was dealing directly with the contact person at Connecticut Spring.  (Id. at 42, 93).  Brown knew the types of machinery that Connecticut Spring has, the types of machinists for which Connecticut Spring has an on-going need, and the types of candidates who have been successful at Connecticut Spring in the past.  (Id. at 42-44). Brown's contact is not the hiring decision maker; she forwards the resumes on to the line manager who is someone Brown has never met.  (Id. at 44-45).  However, Brown's contact is the "gatekeeper" through whom Brown would have to get a candidate to a line manager.  (Id. at 45).  Much of the information that Brown has from his working relationship with his contact at Connecticut Spring is information in his memory because of his familiarity with the client's likes, dislikes, preferences and rate structure.  (Id. at 45-46).

At the time that Brown was hired by OEM ProStaffing, OEM ProStaffing was not doing any work for Connecticut Spring, but just two months later, in January 2013, OEM ProStaffing was the staffing company that had the most temporary employees at Connecticut Spring.  (Id. at 38-39; see id. at 41-42).  During the month of May 2013, Brown was doing approximately $20,000 worth of business a week with Connecticut Spring, which translates to more than $1,000,000 of business per year.  (Id. at 39-42; Hearing Exh. 7).  Connecticut Spring similarly has become Brown's "biggest customer at OEM ProStaffing."  (Tr. at 35).

Wendy Ward, Roth Staffing's Practice Manager, continues to make on-going efforts to sell staffing services to Connecticut Spring, as does her manager, Theresa Del Vecchio, but without success.  (Tr. at 148).

### b. LINCOLN WASTE

While Brown was employed by Roth Staffing, David Fernandez, in his role as president of OEM America, referred Lincoln Waste, located in Bloomfield, Connecticut to

Brown for staffing services, as OEM America is a PEO. (Id. at 26, 49; see also Hearing Exh. 12).[8]  Brown and Elaine Carpino, another BSM from Roth Staffing, met three members of Lincoln Waste's management, after which Carpino provided administrative and clerical staffing services to Lincoln Waste on behalf of Roth Staffing. (Tr. at 26-28).

Shortly after Brown was hired by OEM Prostaffing, on January 3, 2013, he made a sales call to Lincoln Waste with Lori DiVicino, a salesperson employed by OEM America, meeting with the same three executives again. (Id. at 28-29; Hearing Exh. 4). Brown testified that during this sales call, DiVicino advised them "something to the effect of, 'We have a staffing company now.'" (Tr. at 29). When Brown returned to his office after the meeting, he sent an e-mail to one of these executives, in which he stated that he "wanted to get back to you asap to get started on any openings you have." (Hearing Exh. 4; Tr. at 29-31).  Brown also sent him an e-mail to "get started on the scanning opening" and offer a candidate for that opening. (Hearing Exh. 4).  On or about January 8, 2013, Brown posted a customer service representative position at Lincoln Waste, which is the same type of position that Carpino would have filled for Roth Staffing. (Hearing Exh. 5; Tr. at 31-32).

In a subsequent e-mail dated January 23, 2013, sent to his contact at Lincoln Waste, Brown "apologize[d] for [his] stalker mentality[,]" and explained that "time kills all deals." (Hearing Exh. 6; Tr. at 32-33).  Brown also testified that frequent communication with a customer and regular recruitment of new customers is important to increase the likelihood that a customer will choose OEM ProStaffing's candidate for the position. (Tr. at 33-34, 47-48).

At the time of the hearing, OEM Staffing had two placements at Lincoln Waste (id.

---

[8]See note 6 supra.

at 73), and after Brown was hired by OEM ProStaffing, OEM ProStaffing received the exclusive opportunity to fill the roles of chief financial officer and general manager at Lincoln Waste when those positions became available.  (Id. at 34-35).

Roth Staffing's sales to Lincoln Waste have declined in the fourth quarter of 2012 and the first and second quarters of 2013.  (Hearing Exh. 14; Tr. at 125-26).  As Miller and Ward both testified, this decline in sales to Lincoln Waste has had a significant impact specifically on Carpino, a single mother who earns commissions on her sales of Roth Staffing's services to Lincoln Waste; as with Connecticut Spring, plaintiff has made continuing efforts to retain Lincoln Waste's business, again without success.  (Tr. at 124-27, 149-51; Hearing Exhs. 12, 14).

### c. DRI-AIR AND AQUA BLASTING

Brown sold staffing services to Aqua Blasting, also located in Bloomfield, and Dri-Air, located in East Windsor, Connecticut, when he worked with Roth Staffing and continued to sell staffing services to them both after he started working at OEM Prostaffing.  (Tr. at 49-50; see Hearing Exh. 14).  Brown started working with Dri-Air in 2004, and continued selling to them while working for Roth Staffing, and continues to sell to them while working for OEM ProStaffing.  (Id. at 50).  Similarly, Brown sold services to Aqua Blasting while working for Roth Staffing and continued to do so while working for OEM ProStaffing.  (Id. at 49-50).

### d. CANDIDATES AND PLACEMENTS

Brown has placed a number of job postings on behalf of OEM ProStaffing.  (Id. at 31-32, 51-54; Hearing Exhs. 5, 9). Most of the positions Brown tries to fill are in the Greater Hartford area, and most of the job candidates he submits for these positions live in and around that area.  (Tr. at 48-49).  According to Brown, his "zone of influence" is fifteen or

twenty miles outside of Hartford.  (Id. at 49).   However, like his sales and placement activities for Roth Staffing, Brown's activities for OEM ProStaffing extend beyond the immediate vicinity of Hartford and include areas outside of Hartford County, such as Western Massachusetts and Waterbury, Connecticut.  (Id. at 53-54).  As Brown explained, "I really don't have a sales territory.  I mean, wherever I can get business and fill it." (Id.).

### 5. DEFENDANTS' REFUSALS TO STOP BROWN'S COMPETITVE ACTIVITIES ON BEHALF OF OEM PROSTAFFING

After Brown started working at OEM ProStaffing, Miller contacted Brown and asked him if he was working in the Hartford area.  (Id. at 56).  Miller had learned from his co-workers that Brown was directly competing against Roth Staffing's Ultimate Staffing division that was responsible for clerical and manufacturing placements, and specifically, that Brown was selling to Connecticut Spring. (Id. at 119).  Miller told Brown that he was concerned that his actions might impact his former co-workers' earnings, and their families.  (Id. at 57).  Brown described the phone call as an "awkward conversation[,]" and he "assumed from there" that Roth Staffing might take legal action against him if he violated the Employment Agreement.  (Id.).  Miller testified that Brown "assured [Miller] that everything that [Brown] was doing was in compliance with his noncompete and that we, as a company, and he, as a person, had nothing to worry about."  (Id. at 120).  Miller similarly agreed that Brown had told him that "[e]verything would be okay" and that Brown was "basically noncommital with him."  (Id. at 56-57).

Soon thereafter, Brown received a letter from Roth Staffing's attorney, in which a copy of the Employment Agreement was enclosed; the letter reminded Brown of his legal obligations to Roth Staffing. (Id. at 58-59; Hearing Exh. 10).  Instead of reading the letter, Brown gave it to his attorney and showed it to Fernandez, who said he received a copy of

the same letter and told Brown, "We'll take care of it, don't worry about it." (Id. at 59-60). Fernandez and Brown never had any discussions about finding Brown a different job until his one-year noncompetition expired. (Id. at 61).

###### C. PRELIMINARY INJUNCTION STANDARD

"A preliminary injunction is an extraordinary and drastic remedy [that] is never awarded as of right." Munaf v. Geren, 553 U.S. 674, 689-90  (2008)(citations & internal quotations omitted).  In each case, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  Winter v. Nat'l Resources Defense Council, 555 U.S. 7, 24 (2008)(citations & internal quotations omitted).

To succeed on a motion for preliminary injunction, the moving party must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the moving party requesting the preliminary relief." Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd, 598 F.3d 30, 35 (2d Cir. 2010)(multiple citations & internal quotations omitted); see MacDermid, Inc. v. Raymond Selle and Cookson Group PLC, 535 F. Supp. 2d 308, 315 (D. Conn. 2008)(citation omitted).   The court "must consider whether irreparable injury is likely in the absence of an injunction, [the court] must balance the competing claims of injury, and [the court] must pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Salinger v. Colting, 607 F.3d 68, 79 (2d Cir. 2010)(citations & internal quotations omitted).

1. LIKELIHOOD OF SUCCESS ON THE MERITS

Roth Staffing need not show that success on the merits is "an absolute certainty." United Rentals v. Bastanzi, No. 3:05 CV 596 (RNC)(DFM), 2005 WL 5543590, at 4, n.6 (D. Conn. Dec. 22, 2005)["Bastanzi"](citation & internal quotations omitted), approved in relevant part over objection, 2006 WL 346317 (D. Conn. Feb. 8, 2006). Rather, it "need only make a showing that the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt." Id. (citation & internal quotations omitted). In its Complaint, in addition to its claim for a violation of CUTSA, plaintiff asserts claims for breach of contract, and tortious interference with contract. (Dkt. #1). Before the Court may reach the question of whether the Agreement has been breached, the Court must consider whether the Agreement is enforceable.

"[U]nder Connecticut law, post-employment covenants are valid if reasonable under the circumstances." MacDermid, 535 F. Supp. 2d at 316 (citation omitted); see also Scott v. General Iron & Welding Co., 171 Conn. 132, 137 (1976). The five factors to be considered in evaluating the reasonableness of a restrictive covenant ancillary to an employment agreement are: (1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection offered to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of the interference with the public's interests. MacDermid, 537 F. Supp. 2d at 316; Robert S. Weiss & Assocs., Inc. v. Wiederlight, 208 Conn. 525, 529, n.2 (1988)["Robert S. Weiss"]; Scott, 171 Conn. at 137; New Haven Tobacco Co. v. Perelli, 18 Conn. App. 531, 533-34 (App. Ct.), certif. denied, 212 Conn. 809 (1989). "The five prong test of Scott is disjunctive, rather than conjunctive; a finding of unreasonableness in any one of the criteria is enough to render the

16

covenant unenforceable."  New Haven Tobacco, 18 Conn. App. at 534 (citation omitted). The "party challenging the restrictive covenant has the burden of showing that it is unenforceable."  Drummond American LLC v. Share Corp., No. 3:08 CV 1665(MRK), 2009 WL 3838800, at *3 (D. Conn. Nov. 12, 2009), citing Scott, 171 Conn. at 139.

Covenants not to compete that include geographic and time restrictions are valid if they are reasonably limited and fairly protect the interests of both parties.  See Scott, 171 Conn. at 140 (upholding five year covenant barring employee from working as a manager in a competing business); see also Robert S. Weiss, 208 Conn. at 530-31 (upholding two year restriction in restricted geographical area); Torrington Creamery, Inc. v. Davenport, 126 Conn. 515, 520 (1940)(upholding a two-year restriction applicable to specific and limited geographic area).

The noncompetition and anti-solicitation provisions in Sections 3.3 and 3.6 are both for a one-year period.  (Hearing Exh. 2, §§ 3.3, 3.6).  The one year period is tolled by the length of time that Brown has breached these provisions.  (Id., § 4.3).  Consistent with Connecticut precedent, this Court finds that the one-year period is a reasonably limited amount of time.  See Robert S. Weiss, 208 Conn. at 530-31 (upholding two year restriction); Scott, 171 Conn. at 140 (upholding five year covenant); Torrington Creamery, 126 Conn. at 520 (upholding a two-year restriction); see also Bastanzi, 2005 WL 5543590, at *7 (defense counsel conceded that one-year restriction is reasonable).

Geographic restrictions are reasonable when they protect the areas in which a company does business.  See Scott, 171 Conn. at 137-39; see Bastanzi, 2005 WL 5543590, at *7 (seventy-five mile radius captures the market serviced by plaintiff and is enforceable). The twenty-five mile restriction in Section 3.3 is reasonably limited to the area in which Roth

Staffing Hartford's office does business.  According to Brown, his "zone of influence" is fifteen or twenty miles outside of Hartford (Tr. at 48-49), and as he explained, when he worked in Roth Staffing's Hartford office, Brown's sales and placement activities extended beyond the Hartford area and included Western Massachusetts and Waterbury, Connecticut.  (Id. at 54).[9]

The anti-solicitation provision in Section 3.6 does not contain an express geographic restriction; it is limited to customers and prospective customers "known to [Brown] or with whom [Brown] had contacts or dealings during his[] employment.  (Hearing Exh. 2, § 3.6). Such a customer-specific restriction is reasonable. See Robert S. Weiss, 208 Conn. at 531-32 (collecting cases)(barring solicitation of accounts that existed when employee left business is reasonable in view of the plaintiff's business situation).

The restrictive covenants in the Agreement are reasonably designed to afford a fair degree of protection to Roth Staffing. As Brown testified, he developed his customer relationships over a significant period of time, while being compensated by Roth Staffing. (Tr. at 37, 46, 86).  Brown's investment of time in getting to known these customers gave him a distinct advantage in the market as he learned the identities of the individual contact persons at these customers, the pricing applicable to the customers, their buying cycles, the types of jobs they need to fill, the types of candidate they seek, and the customers' likes and dislikes.  (Id. at 13-15).  "Given the nature of the plaintiff's customer-driven business, it is reasonable for it to be concerned that an employee with extensive relationships with its customers, such as the plaintiff, might be in a position to threaten its business if the employee works for a competitor." Bastanzi, 2005 WL 5543590, at *7, citing Elizabeth Grady

---

[9]As Miller testified, in his eighteen years in the staffing industry, a twenty-five mile restriction is "[fifty] percent less than what most competitors would ask their potential employees to sign when entering into [an] employment agreement." (Id. at 115).

18

Face First, Inc. v. Escavich, 321 F. Supp. 2d 420, 425-27 (D. Conn. 2004)(concluding "twenty-five mile radius covers a range of territory reasonably necessary for the protection of Elizabeth Grady's goodwill and its investment in its customers). In Bastanzi, the court held that a restrictive covenant that prohibited a salesperson from competing within seventy-five miles of the office where he had worked for the plaintiff was reasonable as such a restriction offered a fair degree of protection to the employer given the nature of the business. 2005 WL 5543590, at *6-7. Similarly, the twenty-five-mile radius in this case is reasonable and provides a fair degree of protection to Roth Staffing.

Defendant Brown contends that the Agreement unduly restricts Brown's ability to earn a living.   (Dkt. #54, at 17). "By its very nature, the restrictive covenant affects the defendant's opportunity to pursue his occupation." Bastanzi, 2005 WL 5543590, at *7. However, this one does not do so unreasonably. See Scott, 171 Conn. at 138. As evidenced by Brown's ability to secure employment at SNI in Holyoke, Massachusetts, at a higher base salary than he was earning at Roth Staffing, as well as commissions, Brown is not deprived from the ability to earn a living.  Since Holyoke is more than twenty-five miles from Hartford, it is not covered by the twenty-five-mile geographic restriction contained in Section 3.3 of the Agreement. (See Hearing Exh. 2, § 3.3; see Tr. at 118).  Moreover, the twenty-five mile restriction is more limited than similar restrictive covenants common in the industry.  As Miller testified, in his eighteen years in the staffing industry, a twenty-five mile restriction is "[fifty] percent less than what most competitors would ask their potential employees to sign when entering into [an] employment agreement."  (Tr. at 115).  Both Miller and Ward testified that while it took some time, they both transitioned successfully from other markets into their current geographic markets.  (Id. at 117, 146-47).  Rather than continuing to work

19

at SNI for the one year period covered by the Employment Agreement, Brown left after one week and began competing with Roth Staffing at OEM ProStaffing's office, located less than three miles from Roth Staffing's Hartford Office.   Brown has not established that the restrictive covenant unduly restricts his ability to earn a living.  See United Rentals v. Frey, No. 3:10 CV 1628 (HBF), 2011 WL 693013, at *7 (D. Conn. Feb. 18, 2011)["Frey"](restriction is reasonable when defendant "made no attempt to search for a job in a field or location that would not violate the Agreement."); Bastanzi, 2005 WL 5543590, at *7 (a covenant does not deprive the defendant the ability to earn a living when he is "permitted to work anywhere except in competition with the plaintiff within the restricted geographical area for a limited time period.").

Finally, there is no evidence that the enforcement of this covenant will harm the public interest.   While Brown contends that "[a]ny attempt to chill competition by [Roth Staffing] through injunctive relief would eliminate a key member of the staffing market: OEM ProStaffing," and would eliminate Brown, "a key member of the staffing workforce[,]" (Dkt. #46, at 11), it is undisputed that Fernandez previously had operated a business, OEM America, which only entered the staffing industry in November 2012, when Brown was hired as the only employee of defendant OEM ProStaffing. (Tr. at 24).

Accordingly, having found that the Employment Agreement is enforceable, the Court now addresses plaintiff's likelihood of succeeding on its breach of contract claim, CUTSA claim, and tortious interference with contract claim.

<u>a. BREACH OF CONTRACT CLAIM</u>

The elements of a breach of contract claim under Connecticut law are (1) formation of the agreement, (2) performance by one party, (3) breach by the other party and, (4)

damages.  United Rentals, Inc. v. Price, 473 F. Supp. 2d 342, 346 (D. Conn. 2007)(citation omitted).  In light of the conclusion in Section I.C.1. supra, the Court finds that there is an enforceable Employment Agreement between the parties.  As discussed above, it is undisputed that Brown signed his Employment Agreement in June 2010, and that his signature thereto was a condition of employment.  Moreover, as discussed above, Roth Staffing has satisfied its burden of establishing the likelihood of success on its claims that Brown has been breaching Sections 3.3 and 3.6 of the Agreement, and in turn, is breaching the confidentiality provisions of  Section 3.1.

### b. CONNECTICUT UNIFORM TRADE SECRETS ACT

The Court may award injunctive relief against both defendants under the CUTSA. CONN. GEN. STAT. § 35-52(a)("Actual or threatened misappropriation may be enjoined upon application to any court of competent jurisdiction.").  Under Connecticut law, a protectable "trade secret" is broadly defined as

> information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

CONN. GEN. STAT. § 35-51(d).  As discussed above, the Staff Suite program contains collected customer information that is inherently valuable to Roth Staffing, for which Roth Staffing seeks to keep confidential through password protection and by requiring its employees to sign noncompete agreements.   Brown admitted under oath that he had access to Roth Staffing's "trade secrets and other confidential and proprietary information" during his

employment with Roth Staffing.  (Tr. at 11-12).[10]  Additionally, Brown signed the Agreement in which he acknowledged that he "will have access to confidential information maintained at substantial cost by the Company regarding its temporary employees, regular employees, applicants, and prospective and actual customers."  (Hearing Exh. 2, § 3.1).  In light of the fact that Roth Staffing need not show that success on the merits is "an absolute certainty[,]" and that there "may remain considerable room for doubt[,]" Bastanzi, 2005 WL 5543590, at 4, n.6 (citation & internal quotations omitted), Roth Staffing has satisfied its burden of establishing a likelihood of prevailing on this claim.

### c. TORTIOUS INTERFERENCE CLAIM

Under Connecticut law, the elements of a claim for tortious interference with contract are "1) the existence of a contract or a business relationship; 2) defendants' knowledge of that relationship; 3) defendants' intentional and tortious interference with that relationship; and 4) actual loss suffered by the plaintiff."  Weber v. Fujifilm Med. Sys. USA, Inc., No. 3:10 CV 401(JBA), 2013 WL 1149932, at *3 (D. Conn. Mar. 19, 2013)(multiple citations omitted). "To succeed on a tortious interference claim," Roth Staffing must "prove at least some

---

[10]Brown strenuously argues in his briefs that he does not possess any of Roth Staffing's confidential information; that the information was readily available; and that Brown's success at OEM ProStaffing is only due to the fact that he is an "aggressive, self-starter, self-trained staffing professional[.]" (Dkt. #54, at 13-14, 17-18; see Dkt. #46, at 7-8). Brown's credibility is questionable.  On the resume that Brown submitted to Roth Staffing, Brown indicated that while working with OEM America, he "Closed deals with total profit to company in excess of [$300,000]." (Hearing Exh. 13).  However, at the hearing, Brown admitted that he lied on his resume to Roth Staffing, and that he did not make one deal while working for OEM America.  (Tr. at 89-90). Additionally, Brown testified that he does not have a college education, an associate's degree, or any type of advanced education (Tr. at 80), yet, on his resume, Brown touts his attendance at "Holyoke Community College - Business-Management/Engineering 1984-1986".  (Hearing Exh. 13). Similarly, in a job posting dated February 26, 2013, Brown wrote that OEM ProStaffing has "decades of experience" in recruiting and placing manufacturing and production workers with "the most respected clients in the Hartford market[.]"  (Hearing Exh. 9).  At the time that he wrote this, OEM Prostaffing had been providing staffing services through Brown for only three months.  (Tr. at 52-53).

improper motive or improper means" used by OEM ProStaffing, resulting in a breach of Brown's Employment Agreement with Roth Staffing. <u>Id.</u> (citations omitted). Roth Staffing is likely to show that OEM ProStaffing was aware of the Employment Agreement, as Brown provided Fernandez a copy of the Agreement, and Miller called both Brown and Fernandez to remind them of Brown's obligations under the Employment Agreement. (Tr. at 59-61, 119-20). Additionally, Roth Staffing is likely to show that OEM Prostaffing intended to interfere, actually interfered, and continues to interfere with the Employment Agreement, causing Roth Staffing damages. Brown testified that when Fernandez received a letter from Roth Staffing's attorney along with the copy of the Employment Agreement, Fernandez told Brown, "We'll take care of it, don't worry about it." (<u>Id.</u> at 59-60). Fernandez, however, continues to employ Brown in a position in which he competes with Roth Staffing, and continues to reap the benefit of Brown's sales to his former Roth Staffing customers. Accordingly, Roth Staffing is likely to succeed on the merits of its claim for tortious interference with contract.

2. IRREPARABLE INJURY

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." <u>Bisnews AFE (Thailand) Ltd. v. Aspen Research Group, Ltd.</u>, 437 F. App'x 57, 58 (2d Cir. 2011)(citation & internal quotations omitted). Plaintiff must demonstrate that "absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm. <u>Id.</u> (citations & internal quotations omitted). "A number of Connecticut courts and courts in this district have held that irreparable harm may be assumed in cases where the plaintiff alleges a breach of a restrictive covenant."

23

Bastanzi, 2005 WL 5543590, at *8, citing Pop Radio, LP v. News America Marketing In-Store, Inc., No. X08 CV 054002814, 2005 WL 3112887, at *5 (Conn. Super. Ct. September 15, 2005); Sagarino v. SCI Conn. Funeral Servs., Inc., No. CV 000499737, 2000 WL 765260, at *2 (Conn. Super. Ct. May 22, 2000)("Irreparable injury and lack of an adequate remedy at law is considered to be automatically established where a party seeks to enforce a covenant not to compete."); Musto v. Opticare Eye Health Ctrs., Inc., No. 155663, 2000 WL 1337676, at *3 (Conn. Super. Ct.  Aug. 9, 2000)(same); Century 21 Access Am. v. Lisboa, 35 Conn. L. Rptr. 272, 273 (Conn. Super. Ct. 2003)(finding that Connecticut courts typically find per se irreparable harm when a non-compete clause has been breached.); see also Frey, 2011 WL 693013, at *9.  "This is because when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm." Frey, 2011 WL 693013, at *9 (citation & internal quotations omitted).

Moreover, as recited above, in Section 3.3 of the Employment Agreement, Brown agreed during the term of his employment, and for a period of one year thereafter, shall not compete with Roth Staffing within a twenty-five mile radius of the Company.  (Hearing Exh. 2, § 3.3). Shortly after Brown was terminated from his employment with Roth Staffing on October 29, 2012, he went to work for SNI, located more than twenty-five miles from Hartford, but he stopped reporting to work at SNI after only one week of employment.  (Tr. at 20-21).  Brown acknowledged that Section 3.3 would not prohibit him from working for SNI.  (Id. at 19).

On November 7, 2012, Brown began working for defendant OEM ProStaffing in East Hartford, located only three miles from Roth Staffing's Hartford office. (Tr. at 21-22; see Hearing Exh. 3). His work for OEM ProStaffing, a competitor of Roth Staffing, is in breach of

24

Section 3.3. of the Agreement.

Additionally, as recited above, Section 3.6 of the Employment Agreement governs the solicitation of customers and prospective customers.  (Hearing Exh. 2, § 3.6). Brown's actions of calling his contacts at Connecticut Spring and Lincoln Waste, Roth Staffing's customers, to inquire about openings for temporary workers, and offering to fill such positions, are in breach of the non-solicitation provision of Section 3.6 of the Agreement.  (Tr. at 57-58). These breaches constitute irreparable harm.

As Brown testified, he had access to Roth Staffing's trade secrets[11] and confidential information stored in Roth Staffing's  password protected Staff Suite program, and stored as information Brown retained in his memory, which he learned over his time with Roth Stafifng and which gives him an advantage in selling staffing services in competition with Roth Staffing.  (Tr. at 11-12, 45-46).  As Brown acknowledged, the Staff Suite program details information regarding Roth Staffing's customers and job candidates, including notes from customer contacts, customers' purchasing histories, jobs filled, pay rates, bill rates, past relationships, overall utilization, and how and when each customer hires temporary or permanent employees  (Tr. at 14-15), and while working for Roth Staffing, defendant Brown was involved in setting Roth Staffing's bill rates, which information is not publicly available. (Id.).

Brown also elaborated on his dealings with Connecticut Spring and Lincoln Waste, in direct competition with Roth Staffing.  At the time that Brown left Roth Staffing in September 2012, he was the only person in the Company who was dealing directly with the contact person at Connecticut Spring, and as Brown acknowledged, he knew the types of machinery

---

[11]See Section I.C.2.b. supra.

that Connecticut Spring has, the types of machinists that Connecticut Spring has an on-going

need for, and the types of candidates who have been successful at Connecticut Spring in the

past.  (Id. at 42-46, 93-94).  This customer information gives him a distinct advantage in

selling staffing services, and this information has been used to the benefit of Roth Staffing's

competitor.   Brown also testified that his "stalker mentality" towards Lincoln Waste, and his

frequent communication with customers and regular recruitment of new customers is

important to increase the likelihood that a customer will choose OEM Prostaffing's candidate

for the position. (Id. at 33-34, 47-48).  Brown has placed a number of job postings on behalf

of OEM Prostaffing  (Id. at 31-32, 51; Hearing Exhs. 5, 9), most of which are in the Greater

Hartford area.  (Tr. at 48-49; see also Hearing Exh. 8).[12]

          In addition, Brown acknowledged that if Roth Staffing's confidential information is

used by competitors or other third parties, it "could cause substantial and irreparable damage

to [Roth Staffing]."  (Hearing Exh. 2, § 3.1).   Brown is soliciting and marketing Roth

Staffing's customers.  Brown's signature on the Agreement is an "acknowledgment, if not an

admission, [or] at least evidence and a recognition of the reality that money damages are

---

[12]Brown also testified that when he worked for Balance Staffing, a staffing company named
Volt, and Scintillo Consulting, after working for Roth Staffing in 2006-07, Roth Staffing did not try
to enforce its noncompete agreement.  (Tr. at 66). Defendants contend that the "lack of
irreparable harm is also evident in the fact that [Roth Staffing] did not attempt to enforce an
earlier non-compete agreement[.]" (Dkt. #54, at 13, ¶ 7).

          Roth Staffing's actions, or lack thereof, relating to previous noncompete agreements is
irrelevant to the pending action as the 2010 Agreement states that it is "the entire agreement and
understanding between the parties" and "supersedes all other agreements" between the parties
with respect to the same subject matter of the Agreement.  (Hearing Exh. 2, § 4.6).  Additionally,
the Agreement also provides, "[e]ither party's failure to enforce any provision or provisions of this
Agreement shall not in any way be construed as waiver of any such provision or provisions, or
prevent that party thereafter from enforcing each and every other provision of this Agreement."
(Id., § 4.4).  Moreover, as plaintiff accurately observes, there was no evidence offered that Brown
violated his previous employment when he left the Roth Staffing in 2007, or that, if he did, the
Roth Staffing was aware of such a violation. (Dkt. #48, at 23, n.4).

not sufficient to remedy the loss." Bastanzi, 2005 WL 5543590, at * 8 (citation omitted). Considering all of the foregoing, Roth Staffing has established sufficient evidence of irreparable harm to justify the issuance of an injunction.

Having found that plaintiff has demonstrated a likelihood of success on the merits and irreparable harm, plaintiff should be granted a preliminary injunction.  However, the following two issues remain for additional briefing:

(1) As previously indicated, Section 4.3 of the Employment Agreement provides that "[e]mployee agrees that the time provisions contained in Sections 3.3, 3.5 and 3.6 shall be tolled by the length of time during the period in which [e]mployee is in breach of said provisions." Should this one year period commence on June 26, 2013, when the Court granted the parties' Joint Motion for Stipulated Order (Dkts. ##30, 34) or should it commence on the date of this Recommended Ruling?  See Frey, 2011 WL 693013, at *10 (injunction runs from one year of Recommended Ruling); Bastanzi, 2005 WL 5543590, at *9 (same).

(2) FED. R. CIV. P.  65(c) provides: "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."   While this issue is seldom discussed in the many decisions in this district where preliminary injunctions have been granted in these contexts, or addressed merely in passing, see, e.g., Frey, 2011 WL 693013, at *11 (no bond required, as set forth under language of the employment agreement); Bastanzi, 2006 WL 346317, at *1 (remanding matter back to U.S. Magistrate Judge to determine appropriate amount of bond),[13] the question of bond has

---

[13]As a result, it is no surprise that this issue was not raised in any of the parties' multiple briefs.

been discussed in considerable detail in decisions issued by all four federal district courts in New York in this precise context.  See, e.g., Leibowitz v. Aternity, Inc., No. 10 CV 2289 (ADS), 2010 WL 2803979, at *25-26 (E.D.N.Y. July 14, 2010); Juergensen Def. Corp. v. Carleton Techs., Inc., No. 08-CV-959A, 2010 WL 2671339, at *14-15 (W.D.N.Y. June 21, 2010); Mercator Risk Servs., Inc. v. Girden, No. 08 Civ. 10795 (BSJ), 2009 WL 466150, at *9 (S.D.N.Y. Feb. 23, 2009); Payment Alliance Int'l, Inc. v. Ferreira, 530 F. Supp. 2d 477, 485 (S.D.N.Y. 2007); Innoviant Pharm., Inc. v. Morganstern, 390 F. Supp. 2d 179, 195-96 (N.D.N.Y. 2005); Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc., 323 F. Supp. 2d 525, 541-42 (S.D.N.Y. 2004).

Thus, should plaintiff be required to post a bond under the circumstances of this case, and if so, in what amount?

Supplemental briefs on both issues are due **on or before November 8, 2013**, and briefs in response shall be filed **on or before November 22, 2013**.[14]

### III. CONCLUSION

For the reasons stated above, plaintiff's Motion for Preliminary Injunction (Dkt. #3) is granted.

The parties are free to seek the district judge's review of this recommended ruling. See 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further**

---

[14]Either any counsel believes that a settlement conference before this Magistrate Judge would be productive, he should contact Chambers accordingly.

**appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 16th day of October, 2013.

/s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
U.S. Magistrate Judge